*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

TREVOR LYNN DOUBLE,

Defendant-Appellant.

UNPUBLISHED
October 16, 2025
8:58 AM

No. 361950
Van Buren Circuit Court
LC No. 2021-023128-FC

Before: RICK, P.J., and MALDONADO and KOROBKIN, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of torture, MCL 750.85; first-degree criminal sexual conduct (CSC-I) (sexual penetration during commission of a felony), MCL 750.520b(1)(c); unlawful imprisonment, MCL 750.349b; and assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84. We affirm.

## I. FACTUAL BACKGROUND

The victim met defendant on a dating website called "Meet Me" in March 2021. About a month later, the victim and defendant went on their first date. Afterward, the victim and defendant continued to see each other and communicate over the phone. On approximately April 8, 2021,[1] defendant unexpectedly arrived at the victim's house in Battle Creek, where she lived with her mother. The two spent the day driving around town together. Defendant and the victim picked the victim's son up from school in the afternoon. At one point, the victim told defendant that she wanted to go home because she needed to feed her son and put him to bed. Defendant responded that he needed help finding his daughter. He explained that "he knew where she was but he needed

---

[1] The victim did not provide exact dates or times for much of her testimony. She testified that she suffered from head trauma and had trouble with her memory as a result of the injuries defendant inflicted on her. On cross-examination, the victim testified that she was "positive" that defendant took her to a hotel on April 9, 2021, but she later admitted that it could have been April 8, 2021.

a witness with him to say if the police were called that this was really happening." The victim agreed to go with defendant.

Defendant then took the victim and her son to a hotel. The victim stated that defendant proceeded to beat her, choke her, and threaten her with a knife. Defendant also accused her of lying about messaging other people.[2] The victim's son was awake for part of the assault. The victim testified that "[she] was scared for [her] life" and for her son's safety. The following morning, the victim begged defendant to let her take her son to school. Defendant agreed. Together they dropped off her son. The victim arranged for a family member to pick her son up from school.

The victim later told defendant that she wanted to go home. He took her to his parents' house in Van Buren County instead. He told the victim that his parents were on vacation in another state. On the drive there, defendant beat the victim with her cell phone before removing the SIM card and throwing the phone out the car window. When they arrived at defendant's parents' house, defendant took the victim to his bedroom, which was located in the basement. Defendant proceed to yell at the victim and threaten her with weapons.

The victim remained at defendant's house for approximately 28 days. She testified about her experience as follows:

> When he would first start to beat on me it was initially just like choking me and smacking me, and then it later went on he would start dragging me by my hair and he at one point smacked me so hard that I actually flew off of my feet. He would sit on top of me with knives and point knives at me or touch me with them and tell me that he was going to put them inside my body or that he would stab me. He had me against the wall at one time and he had a hatchet in his hand and he told me that if I screamed for help he was going to hack the hatchet with my neck [sic], and when he said that I actually saw my life flash before my eyes.

The victim additionally testified that she had previously engaged in consensual sex with defendant, but that he sexually assaulted her during this 28-day period. She further stated that defendant hit her when they had sexual intercourse.

The victim testified that defendant purchased new phones for her, but that she could not freely communicate with friends and family. She testified that she was able to hold onto it "once or twice" when defendant was nearby watching her. When she texted people, defendant told her what to say. The victim additionally stated that she did not have access to her social media accounts and that defendant forced her to give him her login credentials so that he could access them.

At one point, a police officer left a voicemail for the victim stating that her mother had made a report that she was missing. The victim testified that defendant made her call the officer

---

[2] At trial, the victim did not know the name of the hotel or where it was located, and she testified that she never saw defendant's daughter.

and tell him that "everything was fine" as he held a knife to her side. The officer testified that this phone call lasted only a minute or two and that he did do a follow-up investigation because the victim said that she was fine. The victim's parents called on several occasions, demanding to speak with her. The victim testified that defendant would answer the phone and "hold the phone in his hand to [her] face" with the phone on speaker. He would then "talk low under his breath" and tell her what to say.

Near the end of her time with defendant, defendant punched the victim repeatedly in the chest, for which she required medical attention. Defendant took the victim to the hospital, where she was diagnosed with a broken rib and multiple concussions. The victim told hospital staff and a police officer that she was "beat up by somebody in Battle Creek" because that was what defendant told her to say. She likewise told the officer that she had already filed a police report, although she had not actually done so. The officer did not pursue the investigation any further. The victim testified that she believed defendant would kill her son if she told the truth.

Defendant continued to abuse the victim after they left the hospital. At one point, defendant went through the victim's social media and questioned her about her messages and the people on her friends list. The victim testified that defendant got very agitated and threatened her with a knife. He dragged her by the hair to the laundry room, sat on top of her, and began striking her in the head with a clothing iron. Defendant stated that he was going to "chain [her] up" and leave her there. The victim managed to go back to defendant's bedroom, where defendant threatened her with a hatchet. Defendant put the victim on the bed and "started whacking" her with the hatchet "like it was a paddle." Defendant then began tossing the hatchet in the air and swinging it around. He eventually struck the victim in the leg with the hatchet blade. The victim told defendant that she needed to go to the hospital and get stitches. Defendant stated that he could not take her to the hospital because she would "tell on [him]." Eventually, the victim convinced defendant that she needed to go to the hospital or she would bleed to death.

Defendant took the victim to the hospital, where she received 17 stitches to close the hatchet wound. When hospital staff began discharging the victim, she told them that they could not let her leave because defendant was going to kill her. Hospital staff contacted the police. At some point, defendant left the hospital undetected. Upon arrival, the victim spoke with Detective Mick Masterson and Officer Derek Weldon of the Van Buren County Sheriff's Office. Later that same day, Officer Weldon executed a search warrant at defendant's house. In the basement bedroom, Officer Weldon found identification for defendant, broken cell phones, bloody gauze in the trash can, and an open box of gauze pads. Officer Weldon did not find a hatchet or any other weapons. Officers did not find defendant at the home.

On May 20, 2021, officers received an anonymous tip that defendant was staying at a hotel in the Kalamazoo area. The officers thereafter arrested defendant. The prosecutor charged defendant with torture, MCL 750.85; CSC-I, MCL 750.520b(1)(c); unlawful imprisonment, MCL 750.349b; AWIGBH, MCL 750.84; and assault with a dangerous weapon (felonious assault), MCL 750.82. At trial, the jury heard testimony regarding the previously discussed facts. Before the jury deliberated, the trial court gave the jury the general unanimity instruction, stating:

> A verdict in a criminal case must be unanimous. In order to return a verdict it is necessary that each of you agrees on that verdict. In the jury room you will discuss

the case among yourselves but ultimately each of you will have to make up your own mind. Any verdict must represent the individual considered judgment of each juror.

Defendant was convicted and sentenced as earlier described.[3] He filed a claim of appeal in this Court on July 27, 2022. Defendant thereafter moved for a new trial in the lower court. He argued that (1) he received ineffective assistance of counsel because trial counsel failed to impeach the victim and to investigate or utilize available evidence; (2) there was insufficient evidence to support defendant's conviction of unlawful imprisonment; and (3) the trial court erred and trial counsel was ineffective by allowing the admission of unfairly prejudicial testimony about defendant stealing a car.

In July 2024, defendant moved for leave to file a supplement to his motion for a new trial. The supplement largely reiterated the arguments made in his earlier motion for a new trial. Defendant additionally argued that the trial court erred by failing to give an unanimity instruction to the jury with regard to the charges of torture and unlawful imprisonment. He added that his trial counsel was ineffective for failing to request a specific unanimity instruction. Attached to the supplement were a number of exhibits, including (1) defendant's Google location data for April 2021; (2) text messages between the victim and her father in April 2021; (3) two videos of the victim from April 2021; (4) two police reports from April 2021; and (5) defendant's affidavit.

At a hearing on the motions, defendant argued that there were "great inconsistencies in the complainant's testimony" that should have been addressed by trial counsel. Defendant highlighted video evidence showing that the victim had no visible injuries on several days when she was allegedly beaten and text messages showing that she had access to her phone and communicated with her family throughout that time. Defendant argued that the evidence was not cumulative and was necessary to properly attack the victim's credibility. He further argued that his trial counsel was ineffective for failing to obtain and present that evidence at trial.

The trial court ultimately granted defendant's motion for leave to file a supplement, but denied his motion for a new trial. The trial court examined each of defendant's ineffective-assistance-of-counsel claims and concluded that defendant had "not established that any of the alleged deficiencies undermine[d] confidence in the outcome of the trial." The trial court reasoned that "[t]he complaining witness had significant credibility issues that defense counsel fully and ably aired during the trial, and the jury in fact did not find her fully credible, as evidenced by the verdict of acquittal on the charge of felonious assault."

Defendant moved for reconsideration, which the trial court denied. We now address defendant's claims on direct appeal.

---

[3] The jury acquitted defendant of felonious assault.

## II. ANALYSIS

### A. TIMELINESS OF SUPPLEMENTAL FILING

Despite the trial court granting defendant's application for leave to file a supplement and considering the supplement, defendant argues on appeal that we should conclude that the supplement was timely. The issue is moot.

"It is well established that a court will not decide moot issues." *People v Richmond*, 486 Mich 29, 34; 782 NW2d 187 (2010). "A dispute is moot if no controversy exists and any judgment on the matter would lack practical legal effect." *People v Smith*, 502 Mich 624, 631; 918 NW2d 718 (2018). "Courts will not entertain such abstract issues unless they are of public significance and are likely to recur, yet may evade judicial review." *Id*. at 631-632 (quotation marks and citation omitted). "In general, this Court has applied the doctrine to cases in which the transitory nature of a particular controversy would render the issue moot before a party could obtain appellate review." *Richmond*, 486 Mich at 40. See, e.g., *People v Kaczmarek*, 464 Mich 478, 481; 628 NW2d 484 (2001).

Defendant concedes that the trial court granted leave to file the supplement and reviewed the claims on the merits. Defendant asks that we conclude that it was "within the discretion of the trial court to consider" the supplement, when the trial court has already exercised its discretion to do so. Although the trial court disagreed with defendant's argument that the supplement was timely, the trial court found good cause to grant defendant leave to file the supplement. Even if we were to rule that the supplement was timely, it would have no practical legal effect on these proceedings. See *Smith*, 502 Mich at 631. Further, we conclude that this is not an issue of public significance or an issue that will likely evade judicial review. See *id*. at 631-632.

### B. UNANIMITY INSTRUCTION

Defendant next argues that the trial court erred by failing to give the jury a specific unanimity instruction with regard to the charges of torture and unlawful imprisonment.

Before closing arguments, the trial court reviewed the final jury instructions with both parties and asked if there were any objections. Trial counsel stated that there were none. After reading the jury instructions, the trial court again asked the parties if there were any objections, and trial counsel again stated that he had none. "[C]ounsel's affirmative statement that there were no objections to the jury instructions constitute[s] express approval of the instructions" that waives review on appeal. *People v Matuszak*, 263 Mich App 42, 57; 687 NW2d 342 (2004). Therefore, any direct claim of error regarding the jury instructions is waived.

### C. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next argues that his trial counsel was ineffective for failing to (1) investigate exculpatory and impeachment evidence; (2) subpoena impeachment witnesses; and (3) request a specific unanimity instruction. We disagree.

"Generally, an ineffective-assistance-of-counsel claim presents a mixed question of fact and constitutional law." *People v Hoang*, 328 Mich App 45, 63; 935 NW2d 396 (2019) (quotation

marks and citation omitted). "Constitutional questions are reviewed de novo, while findings of fact are reviewed for clear error." *Id.* However, because we denied defendant's motion for an evidentiary hearing, our review "is for errors apparent on the record." *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020).

A defendant who seeks to establish a claim of ineffective assistance of counsel must show "that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). Counsel is presumed to be effective and defendant bears the burden of proving otherwise. *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021). Defendant likewise bears the burden to establish the factual predicate for the claim. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). "The failure to make an adequate investigation is ineffective assistance of counsel if it undermines confidence in the trial's outcome." *People v Grant*, 470 Mich 477, 493; 684 NW2d 686 (2004). Counsel always has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Trakhtenberg*, 493 Mich at 52.

## 1. FAILURE TO INVESTIGATE

Defendant first argues that trial counsel failed to investigate the victim's phone records and social media records. He claims that both could have been used to contradict the victim's testimony that he prevented her from contacting her family or accessing social media. Defendant further argues that trial counsel failed to investigate the victim's location data, which would have demonstrated that defendant did not unlawfully imprison her.

Defendant merely speculates that these records would have aided him at trial. With regard to the location data, defendant has not demonstrated how this data would have contradicted the victim's testimony or have been exculpatory. The victim testified that she went several places with defendant; therefore, any data to that effect would have supported her testimony and been cumulative of evidence already in the record. Defendant additionally cannot establish the factual predicate for the claim that the victim's social media and cell phone records would have aided him at trial. *Hoag*, 460 Mich at 6. The evidentiary value of the victim's phone and social media records throughout her time with defendant is questionable, particularly given her testimony that defendant often had control of her cell phone, access to her social media, and exercised control over her use of both.

Defendant nevertheless states that certain text message exchanges between the victim and her father should have been used to impeach the victim's testimony, in which she stated that she only contacted her mother during her time with defendant. But, as the trial court explained, "there is reason to doubt that impeachment on this topic would have been particularly effective" because the victim testified that she remembered texting her mother but could not remember texting anyone else. Further, given that trial counsel impeached the victim in other ways, any failure to do so in this instance did not undermine the outcome at trial.

Defendant also argues that trial counsel was ineffective for failing to investigate two incidents in which defendant and the victim spoke with the police. Defendant argues that bodycam footage could have been used to show exactly what the victim told the officers and, in particular,

-6-

that the victim told the officers that someone else had assaulted her. However, defendant has not presented proof that body camera footage of these encounters existed or was available to trial counsel. He likewise has not submitted affidavits or other evidence showing that testimony from the officers would have aided him. Further, trial counsel elicited testimony from the victim that she told an officer at the hospital that somebody she knew in Battle Creek assaulted her and that she did not tell the officers whom she encountered on other occasions that defendant had beaten her. Therefore, it is unclear what benefit further investigation into these incidents would have offered or how the evidence would not have been cumulative. The argument that defendant seeks to make through this evidence—that the victim identified someone other than defendant as the person who assaulted her—was effectively made at trial.

Defendant also argues that trial counsel was ineffective for failing to investigate and utilize videos of the victim from the relevant time frame showing that she was uninjured. In particular, defendant indicates that a video of the victim in lingerie from April 18, 2021, establishes that two weeks into her stay with defendant, she was not injured and was consensually staying with defendant. Further, defendant argues that a video of the victim at a pier also established that she had no injuries, contradicting her claims that she was beaten constantly by defendant.

We agree with the trial court's reasoning on this issue and conclude that failure to use this video evidence was not ineffective assistance of counsel. As the trial court succinctly stated:

> [T]he failure to use the video does not undermine confidence in the outcome of the trial for multiple reasons. First, trial counsel introduced direct evidence to make the same point, calling several witnesses who testified that they observed the complaining witness together with the defendant during the four weeks or so that they lived together in defendant's parents' basement. None of the witnesses observed signs of domestic violence. Second, even if a jury were to accept that the complaining witness lied about being abused prior to April 18, 2021, there was substantial evidence that physical abuse occurred later. The complaining witness went to the hospital on May 2 and 7, 2021, well after the April 18 video was taken. Hospital records and photos introduced into evidence from the May 7 hospital visit establish she had significant physical injuries at that point. Although the complaining witness's credibility was thoroughly impeached, her description of the events that immediately preceded her hospitalization was corroborated by hospital records and evidence defendant fled after dropping her off at the hospital.

With regard to the video at the pier, defendant argues that this video shows the victim removing a mask and sunglasses "revealing a completely unmarked, clear face." Although the quality of the video is poor and the view of the victim is brief, there appear to be visible bruises or marks under the victim's eyes. Further, the victim's body is covered in a hooded sweatshirt, long pants, and a baseball hat. Similar to the trial court's reasoning, we conclude that this video would not have contradicted the significant evidence of the victim's injuries presented a trial. Defendant thus cannot establish the factual predicate for his claim.

## 2. FAILURE TO SUBPOENA WITNESSES

Next, defendant very briefly argues that trial counsel failed to investigate or contact a number of witnesses who may have provided helpful testimony at trial, including the victim's father, several police officers, and other acquaintances who had seen defendant and the victim together in April 2021.

Defendant identifies these proposed witnesses but does not provide any affidavits to indicate what their proposed testimonies would entail. Thus, defendant once again cannot establish the factual predicate for his claim of ineffective assistance of counsel. See *Hoag*, 460 Mich at 6. Furthermore, trial counsel called several witnesses who testified that they saw defendant with the victim and that the victim was not visibly injured. Given the foregoing, it cannot be said that, but for trial counsel's failure to call other witnesses, a reasonable probability exists that the result of the proceeding would have been different. *Trakhtenberg*, 493 Mich at 51.

## 3. FAILURE TO REQUEST JURY INSTRUCTIONS

Finally, defendant argues that trial counsel was ineffective for failing to request a specific unanimity instruction with regard to the charges of torture and unlawful imprisonment. We disagree.

The crime of unlawful imprisonment is governed by MCL 750.349b. The statute states, in relevant part:

> (1) A person commits the crime of unlawful imprisonment if he or she knowingly restrains another person under any of the following circumstances:
>
> (a) The person is restrained by means of a weapon or dangerous instrument.
>
> (b) The restrained person was secretly confined.
>
> (c) The person was restrained to facilitate the commission of another felony or to facilitate flight after commission of another felony. [MCL 750.349b(1)(a) through (c).]

Additionally, the crime of torture is governed by MCL 750.85, which states, in relevant part:

> A person who, with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody or physical control commits torture and is guilty of a felony punishable by imprisonment for life or any term of years.

The Michigan Constitution guarantees criminal defendants the right to a jury trial and a unanimous jury verdict. See Const 1963, art 1, § 14; *People v Cooks*, 446 Mich 503, 511; 521 NW2d 275 (1994). "In order to protect a defendant's right to a unanimous verdict, it is the duty of the trial court to properly instruct the jury regarding the unanimity requirement." *Cooks*, 446 Mich at 511. In most cases, "a general instruction to the jury that its decision must be unanimous will be adequate." *Id*. at 524. The need for a specific unanimity instruction arises in more complex

factual scenarios, such as "in cases in which 'more than one act is presented as evidence of the actus reus of a single criminal offense' and each act is established through materially distinguishable evidence that would lead to juror confusion." *People v Chelmicki*, 305 Mich App 58, 68; 850 NW2d 612 (2014), quoting *Cooks*, 446 Mich at 512-513.

However, a specific instruction is not required in *every* case where multiple acts are presented as evidence of the actus reus of a single offense. *Cooks*, 445 Mich at 512. If "a statute lists alternative means of committing an offense which in and of themselves do not constitute separate and distinct offenses, jury unanimity is not required with regard to the alternate theory." *Chelmicki*, 305 Mich App at 68. The statute governing unlawful imprisonment "expressly provides alternative theories under which a defendant may be convicted. The alternative theories each relate to a single element of the offense, and are merely different ways of establishing that element." *Id*. Because the unlawful imprisonment statute contains alternative means of commission rather than describing materially distinct acts, the general unanimity principles apply. *Id*. The prosecution thus did not need not prove that all of the jurors agreed on the same specific means by which defendant committed unlawful imprisonment, as long as all jurors agreed that one of the statutory alternatives was satisfied. *Id*.; see also *Cooks*, 446 Mich at 519 ("Where the government offers a series of similar acts as proof of the actus reus and there is no indication of juror confusion or disagreement, the general unanimity instruction is deemed sufficient."). Defendant has not presented evidence of juror confusion. He was not entitled to a specific unanimity instruction on unlawful imprisonment.

Defendant was likewise not entitled to a specific unanimity instruction on the charge of torture. Again, the requirement for a specific unanimity instruction is triggered only when acts are established through "materially distinguishable evidence that would lead to juror confusion." *Chelmicki*, 305 Mich App at 68. All of the specific acts constituting torture in this matter were introduced through the victim's testimony. Nothing about her testimony presented the type of materially distinguishable evidence that would create juror confusion about the factual basis of defendant's guilt. *Id*. Additionally, defendant provided a singular defense to the various allegations. This strategy suggests that defendant did not treat the various acts as materially distinct, which also undermines the argument that the jury would be confused about which specific acts to rely upon for conviction. Since the different acts of torture represented evidence of the same criminal offense, rather than separate and distinct acts requiring unanimous agreement, a specific unanimity instruction was not required. *Id*.

Because defendant was not entitled to a specific unanimity instruction regarding the charges of unlawful imprisonment or torture, trial counsel was not ineffective for failing to request those instructions. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel."). Even were we to conclude that trial counsel's performance fell below an objective standard of reasonableness, defendant has not demonstrated that the errors prejudiced him. *Trakhtenberg*, 493 Mich at 51. Accordingly, defendant is not entitled to relief.

Affirmed.

/s/ Michelle M. Rick
/s/ Allie Greenleaf Maldonado
/s/ Daniel S. Korobkin